# Cedar Rapids & Iowa City Railway & Light Company, Appellee, v. Sprague Electric Company, Appellant.

## Gen. No. 21,918.

1. DAMAGES, § 68*—*what is effect of not using reasonable diligence to mitigate.* The rule that a party may recover damages caused by defective construction of property presupposes that the injured party has used reasonable diligence to protect himself from avoidable consequences after discovery of the defect, and his damages are therefore limited to such expenses as he could not have avoided by the exercise of reasonable care.

2. DAMAGES, § 68*—*when buyer may not recover damages resulting from use of warranted article known to be defective.* Where a warranted article proves defective and the danger of its continued usage becomes obvious to the buyer of such article, who knowingly continues to use it without remedying the defect, he does so at his peril, and he cannot, in an action against the seller for breach of warranty, recover for such damages as result of such negligent conduct on his part.

Appeal from the Circuit Court of Cook county; the Hon. LOCK-WOOD HONORE, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1915. Reversed. Opinion filed February 9, 1917.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Cedar Rapids & I. C. Ry. & L. Co. v. Sprague E. Co., 203 Ill. App. 424.

CUMMINS, ROEMER, MILKEWITCH & McKENNA, for appellant; ELIJAH N. ZOLINE, of counsel.

MOSES, ROSENTHAL & KENNEDY, for appellee; HENRY H. KENNEDY and S. SIDNEY STEIN, of counsel.

MR. JUSTICE McDONALD delivered the opinion of the court.

Appellee, the Cedar Rapids & Iowa City Railway & Light Company (plaintiff below) recovered a judgment on a directed verdict against the defendant, the Sprague Electric Company, for the sum of $6,717.40, to reverse which this appeal has been prosecuted.

Plaintiff's action is predicated on a contract of warranty, by the terms of which defendant agreed to furnish and erect for the plaintiff at its plant in Cedar Rapids, Iowa, a monorail electric shovel and runway, to be used by the latter to convey coal to its power plant. This carrying device was operated on an overhead monorail mounted on a steel structure about thirty feet high and seven hundred feet long. This structure, also referred to as a runway, was supported on each side by a row of perpendicular columns, connected on top by transverse beams, all joined and braced so as to form a continuous structure.

The overhead monorail consisted of a series of adjoining I-beams placed midway between the steel columns, and extended the full length of the structure. The beams comprising the monorail or runway beam were fastened underneath the transverse beams above, and were secured thereto by means of iron brackets or lugs. These brackets were riveted to the bottom of the upper flange of the runway beam and to the transverse beams above, and were so secured that the weight of the conveyor as it passed over the runway beam was upon the brackets and not directly upon the rivets which held them in place.

426    Appellate Courts of Illinois.

Cedar Rapids & I. C. Ry. & L. Co. v. Sprague E. Co., 203 Ill. App. 424.

At one point on the runway, however, the lug or bracket was omitted, the runway beam or monorail being secured directly to the crossbeam above by means of four three-fourths inch rivets, two on each side of the beam, placed in holes drilled through the upper flange of the runway beam, so that when the conveyor passed this point its weight was directly upon these four rivets. The section of the monorail so fastened at one end is identified in the record as beam "B-20."

The conveyor was electrically propelled, and, when in operation, traveled along the lower flanges of the I-beams comprising the monorail. The operator's place was in a small inclosure, or "cage," suspended from the monorail.

After the conveyor had been in operation about eight months, the riveted end of the said beam B-20 gave way under the weight of the conveyor as it passed that point, precipitating it to the ground and causing the almost instant death of the operator, one Duncan, who was an employee of the plaintiff.

Subsequently the legal representative of the said Duncan sued plaintiff in the Iowa courts for wrongfully causing his death, and recovered a judgment for $6,161.40 and costs, which amount plaintiff now seeks to recover over from defendant, on an alleged breach of the following warranty contained in the contract under which defendant constructed the said tramway apparatus and equipment:

"The company (defendant) guarantees the apparatus and equipment, covered by this agreement, to be free from imperfections in their manufacture for a period of one year from date of invoice. Should any such defects appear within that time traceable to above causes, the company will repair or replace such defective parts, if an inspection proves the claim. This guarantee also covers the runway beam against

rolling, curling or buckling, due to operation of monorail on its lower flange.''

It appears from the evidence that, shortly after the plaintiff began to operate the conveyor, one of the rivet heads sheared off and fell to the ground, when the conveyor passed the point at which beam B-20 was riveted to the crossbeam above, and after an inspection thereof by plaintiff's employees the rivet was replaced. Thereafter, the rivets continued to shear at this point—sometimes one and sometimes two at a time—and plaintiff continued to operate the conveyor, after replacing them. After the conveyor had been in operation for about six weeks, plaintiff substituted three-fourths inch bolts for the rivets. However, these too proved inadequate, for the weight of the conveyor caused the bolts to break or shear from time to time, as had the rivets.

No complaint was ever made by plaintiff to the defendant, regarding any defect in the construction of the tramway. Some difficulty was experienced with the electrical apparatus in the conveyor, and defendant's electrician, one Rowlands, was sent to Cedar Rapids to make some changes in the motor. On this occasion Duncan informed Rowlands of the insecure beam fastening; that the rivets and bolts had sheared, and that they came near having a serious accident a few days before; that he (Duncan) had noticed a severe jar as the conveyor passed that point, and that upon investigation he discovered that two of the bolts supporting the monorail had broken off. This took place shortly after the substitution by plaintiff of bolts for rivets.

The evidence further shows that Rowlands then took the matter up with one Ford, who was plaintiff's chief engineer and whose duty it was, *inter alia,* to look after the condition of the runway beam, i. e., the monorail, and informed him that it was dangerous to oper-

ate the conveyor over it in that condition; whereupon Ford stated that he was well aware of the necessity of a bracket at this point, and referred Rowlands to his (Ford's) immediate superior, one Martin, who was the assistant superintendent of the plant, for permission to make the bracket. Rowlands further testified that he immediately went to the said Martin and told him substantially what he had already stated to Ford, and asked Martin to authorize the making of such a bracket; that Martin said he would have it attended to; that subsequently he (Rowlands) went back to Ford and discussed with him the manner in which the bracket should be made and put up.

The evidence also shows that at the time in question plaintiff's superintendent, one Green, was out of the city, and that the said Martin was in charge of the plant during Green's absence; that the said Ford took the matter up with Green upon the latter's return, but that Green refused to issue an order to make the bracket and stated it was "up to the Sprague Electric Company to fix that."

Rowlands further testified that at the time in question he made a written report of the matter to the defendant, wherein he stated the situation, and that he had arranged to have plaintiff make a bracket; that he sent one copy thereof to defendant's Chicago and the other to its New York office.

The testimony of Ford was, substantially, a corroboration of Rowlands' testimony, and also showed that the cost of making the bracket in question would have been approximately $6, and that plaintiff had facilities for making it.

Pursuant to Green's direction, no bracket was made, and plaintiff continued to operate the apparatus in its then condition until the date of the accident, without notifying defendant that it had in the meantime decided not to make the necessary change, or that it was relying upon the defendant to do so.

Defendant contends that upon this state of the record plaintiff cannot recover over for the accident in question.

From the foregoing it clearly appears that, prior to the fatal accident, plaintiff had knowledge of the inadequacy of the fastening of the beam at the point in question, and fully realized the danger of operating the conveyor while in such condition; that, notwithstanding this knowledge on its part, it continued to operate the conveyor without making the necessary changes itself or notifying defendant to do so under its contract of warranty.

The rule, that a party may recover damages caused by defective construction of property, presupposes that the injured party has used reasonable diligence to protect himself from avoidable consequences, after discovery of the defect, and his damages are therefore limited to such expenses as he could not have avoided by the exercise of reasonable care. 13 Cyc. 76; Sedgwick on Damages (8th Ed.), vol. 1, p. 295, and cases there cited.

It is undisputed that the apparatus furnished by defendant was defective in the foregoing respect, and therefore unsafe. Plaintiff knew that if the runway beam gave way while the cage was passing the riveted end of beam B-20, serious consequences would follow; and plaintiff was fully aware that by supporting the said beam with an iron bracket, in place of rivets or bolts, the danger would have been obviated. Its assistant superintendent had already agreed to make the necessary alteration. Yet, in the face of this situation, plaintiff's superintendent (Green), upon his return to the city, concluded not to make the bracket, and stated that he would look to defendant to remedy this defect, but without giving defendant notice thereof.

While the purchaser of a warranted article may rely upon his warranty and recover damages for a breach

430 APPELLATE COURTS OF ILLINOIS.

Cedar Rapids & I. C. Ry. & L. Co. v. Sprague E. Co., 203 Ill. App. 424.

thereof, yet where such warranted article proves defective and the danger of its continued usage becomes obvious to the purchaser, who knowingly continues to use it without remedying the defect, he does so at his peril, and he cannot, in an action against the vendor for breach of warranty, recover for such damages as result from such negligent conduct on his part. (*Merrimac Chemical Co. v. American Tool & Machine Co.,* 192 Mass. 206, 78 N. E. 419; *Razey v. J. B. Colt Co.,* 106 N. Y. App. Div. 103, 94 N. Y. Supp. 59; *Uhlig v. Barnum,* 43 Neb. 584, 61 N. W. 749.) To hold otherwise would be to construe the contract of warranty as one of insurance.

Plaintiff makes the point that its assistant superintendent, Martin, had no authority to agree to make the bracket in question. From an examination of the evidence, we are of a contrary opinion, for it is clear that, when this agreement was made, Martin was in charge of plaintiff's plant; that Green was out of the city at the time, and that on such occasions Martin had full authority to act in Green's stead.

Plaintiff had, from the very beginning, replaced sheared rivets without ever notifying defendant, and had afterwards substituted bolts for the rivets, also without defendant's knowledge. When these too proved inadequate, and Rowland's attention was directed to their insufficiency while in Cedar Rapids, he immediately took the matter up with the man then in charge of the plant (Martin), explaining to him the urgency of supporting the runway beam with a bracket in place of rivets or bolts, and Martin assured him it would be attended to. Having consented to this arrangement, it was incumbent upon plaintiff to either carry it out or at least notify defendant that it had decided to annul it, and that it would require defendant to fulfil its warranty.

But even in the absence of any such agreement, it

was plaintiff's imperative duty, upon discovery of the infirmity in the beam fastening, to either make the necessary alteration—the expense of which would have been trifling—or to notify defendant to do so, in the meantime discontinuing the use of the conveyor in its unsafe condition.  In any view of the case, there can be no escape from the conclusion that plaintiff was flagrantly careless in this regard, and that its negligent conduct was the proximate cause of the fatal accident.  Manifestly, therefore, the court erred in directing a verdict for the plaintiff in the sum of $6,717.40, and in refusing to direct a verdict for the defendant. Accordingly, the judgment will be reversed.

*Reversed.*